*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 14, 2023

Plaintiff-Appellee,

v

Nos. 358789; 364433
Gogebic Circuit Court
LC No. 2020-000230-FH

LEROY JAMES HAMM III,

Defendant-Appellant.

Before: GLEICHER, C.J., and GARRETT and MALDONADO, JJ.

PER CURIAM.

These consolidated[1] appeals stem from an incident in which defendant drunkenly waved a gun around in the presence of friends and family. A jury convicted defendant of one count of being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, one count of being a felon in possession of ammunition (felon-in-possession of ammunition), MCL 750.224f(6), two counts of assault with a dangerous weapon (felonious assault), MCL 750.82, and one count of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to serve 4 to 30 years' imprisonment for felon-in-possession, 4 to 30 years' imprisonment for felon-in-possession of ammunition, 4 to 15 years' imprisonment for each felonious assault conviction, and two years' imprisonment for felony-firearm. The sentence for felony-firearm was to run consecutive to one count of felonious assault; otherwise, the prison terms were to be served concurrently.[2] In Docket

---

[1] *People v Hamm*, unpublished order of the Court of Appeals, entered January 17, 2023 (Docket Nos. 358789 and 364433).

[2] Because of an error in designating with which sentence the felony-firearm sentence should run consecutive at the original sentencing hearing conducted on October 4, 2022, defendant was resentenced on December 13, 2022. The trial court then imposed sentences of the same length, but ordered that defendant's felony-firearm sentence run consecutive to and preceding only one of the felonious assault sentences.

No. 358789,[3] defendant raises claims of a speedy trial violation, prosecutorial misconduct, and ineffective assistance of counsel. In Docket No. 364433,[4] defendant challenges the scoring of his sentencing guidelines. In Docket No. 358789, we vacate defendant's conviction and remand for a new trial. Docket No. 364433 is dismissed as moot.

## I. BACKGROUND

On October 30, 2020, defendant was at his home with his mother, Mary Conley; with Conley's boyfriend, Dennis Borseth; and with two of his friends, Jaccob Stigsell and James Schaus. Much of what happened that night is undisputed. Defendant and Borseth were both intoxicated when Borseth removed his gun and showed it to Stigsell. Defendant then took the gun away from Borseth, testifying that Borseth had pointed the gun at defendant. Borseth apparently had a history of behaving recklessly with his gun,[5] and defendant testified that he feared for his life. Stigsell testified that, after disarming Borseth, defendant waved the gun around while belligerently rambling, and while he insisted that defendant's behavior was nonthreatening, Stigsell acknowledged that defendant pointed the gun at both Conley and Schaus. Defendant denied having carelessly waved the gun and insisted that if he had pointed the gun at anybody he did so accidentally. Defendant eventually gave the gun to Conley who hid it in the bathroom.

It is undisputed that Borseth was injured during this encounter; however, the circumstances surrounding the injury were heavily disputed, and Borseth did not testify. It is undisputed that Boresth had a wound on his forehead that bled profusely and required stitches. Sergeant Sterbenz testified that the wound was shaped like "a half-circle" and opined that it was consistent with the shape of the gun's barrel. Moreover, Sergeant Sterbenz testified that there was a red substance on the end of the barrel that appeared to be blood, suggesting that defendant might have struck Borseth with the gun.[6] Schaus testified that he was not sure how Borseth received this wound but believed he had fallen down in the kitchen. Defendant was likewise uncertain and likewise believed Borseth had fallen. Notably, no charges were filed alleging Borseth as a victim.

Defendant was convicted as described above, and these appeals followed.

## II. SPEEDY TRIAL

Defendant first argues that he was denied his constitutional right to a speedy trial. We disagree.

---

[3] Docket No. 358789 arises from the October 4, 2021 judgment of sentence.

[4] Docket No. 364433 arises from the December 13, 2022 judgment of sentence.

[5] There was testimony at trial regarding an incident during which Borseth allegedly fired his gun at someone, nearly hitting them.

[6] It does not appear as though any tests were conducted on this substance to confirm that it was blood or that it belonged to Borseth; however, defendant does not seem to dispute that this substance was, in fact, Borseth's blood.

We review claims of error involving a defendant's right to a speedy trial de novo as a question of constitutional law. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006).

The right to a speedy trial in criminal prosecutions is guaranteed by both the federal and state constitutions. *Id*. at 261, citing US Const, Am VI, and Const 1963, art 1, § 20. Michigan courts apply the four-part test from *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972), to determine whether a defendant's constitutional right to a speedy trial has been violated. *Williams*, 475 Mich at 261. The *Barker* test requires this Court to balance four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262. No single factor is "either a necessary or sufficient condition to" a meritorious speedy-trial claim. *Barker*, 407 US at 533. Rather, courts must "engage in a difficult and sensitive balancing process." *Id*.

While defendant did assert his right to a speedy trial and the delay was attributable to the prosecution, defendant has not established a violation of his speedy trial right because the delay was not particularly long and no harm was caused to defendant's case.

## A. LENGTH OF DELAY

When determining the length of the delay for purposes of the first *Barker* factor, the relevant time period begins at the time of the defendant's arrest. *Williams*, 475 Mich at 261. Defendant was arrested on the night of this incident, October 30, 2020, just shy of 10 months before his trial began in August 2021. "[T]here is no set number of days between a defendant's arrest and trial that is determinative of a speedy trial claim," *People v Waclawski*, 286 Mich App 634, 665; 780 NW2d 321 (2009), but further consideration of the issue is required after a delay of at least six months, *People v Daniel*, 207 Mich App 47, 51; 523 NW2d 830 (1994).

## B. REASON FOR DELAY

When "assessing the reasons for delay, this Court must examine whether each period of delay is attributable to the defendant or the prosecution." *Waclawski*, 286 Mich App at 666. When the reason for a delay cannot be discerned from the record, that period should be attributed to the prosecution. *Id*. "Scheduling delays and docket congestion are also charged against the prosecution," but "delays inherent in the court system, e.g., docket congestion, . . . are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Id*. (quotation marks and citations omitted).

Within days of defendant's circuit court arraignment in December 2020, defendant's trial was tentatively scheduled to take place in June 2021 if another trial did not occur at that time, with a firm date of December 7, 2021. The firm trial date was later moved forward to October 12, 2021. Defendant rejected a plea offer on April 20, 2021. At that time, the court noted that the existing trial dates may be subject to change because the COVID-19 pandemic was affecting the court's scheduling, though priority was being given to cases involving incarcerated defendants. An order entered the next day set defendant's trial for October 13, 2021, and reiterated that defendant's case was designated as the "back-up trial" for June 16, 2021. Defendant filed a motion for speedy trial and personal recognizance on May 18, 2021, which was heard on June 8, 2021. Although the trial

court denied defendant's motion, it again moved defendant's trial forward, scheduling it to begin August 25, 2021. As it had before, the trial court explained that the COVID-19 pandemic was putting constraints on the judicial system and the court was doing its best to afford defendant the earliest trial date possible. Defendant's trial began on August 25, 2021.

In sum, docket congestion was the cause of the delay in this case. As noted, while this is technically attributed to the prosecution, this reason is "given a neutral tint," and we afford it "only minimal weight" with respect to our analysis. *Waclawski*, 284 Mich App at 666.

## C. ASSERTION OF THE RIGHT

Concerning a defendant's assertion of his right to a speedy trial, the United States Supreme Court observed that assertion of the right is entitled to strong evidentiary weight, as "[t]he more serious the deprivation, the more likely a defendant is to complain." *Barker*, 407 US at 531. "The strength of [a defendant's] efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences." *Id*. The record reveals at least two instances in which defendant asserted his right to a speedy trial. First, defense counsel's written appearance, which was filed on November 6, 2020, included a request for a speedy trial. We are not persuaded by the prosecution's contention that "[b]oilerplate language in an appearance is not the same as" a formal speedy-trial demand. The only authority cited for this proposition is a 1971 case in which the "[d]efendant's attorney at the motion hearing represented that Rogers had sent letters demanding the early trial of the case; however, no proofs were received as to the accuracy of the allegations." *People v Rogers*, 35 Mich App 547, 551; 192 NW2d 640 (1971). This case is neither binding[7] nor on point; the decisive fact was that there was no evidence that a demand was actually made, not the informal nature of the alleged demand. Defendant also formally moved for a speedy trial on May 18, 2021, which resulted in defendant's trial being moved forward by seven weeks. This factor weighs in favor of defendant's claim of error.

## D. PREJUDICE

Defendant has not met his burden to establish prejudice arising from the 10-month delay between the arrest and trial.

Regarding the final *Barker* factor, Michigan recognizes "two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to the defense." *Williams*, 475 Mich at 264 (quotation marks and citation omitted). Prejudice to the person occurs from "pretrial incarceration leading to anxiety and concern." *People v Collins*, 388 Mich 680, 694; 202 NW2d 769 (1972). Prejudice to the defense is the more serious concern. *Barker*, 407 US at 532; *Williams*, 475 Mich at 264. The reason for this understanding is straightforward: when pretrial delays inhibit a defendant's defense, it "skews the fairness of the entire system." *Barker*, 407 US

---

[7] "Published opinions of this Court that were issued before November 1, 1990 are not binding, but they may be considered for their persuasive value." *People v Urbanski*, ___ Mich App ___, ___ n 5; ___ NW2d ___ (2023) (Docket No. 359011); slip op at 9 n 5, citing MCR 7.215(J)(1).

at 532; *Williams*, 475 Mich at 264 (quotation marks and citation omitted). By way of example, the defense may be impaired by the death or disappearance of a witness or the fading of memory that naturally occurs over time. *Barker*, 407 US at 532. Prejudice is presumed after a delay of at least 18 months. *Williams*, 475 Mich at 261. Because the delay in this case was not presumptively prejudicial, defendant bears the burden of proving that he was prejudiced by the delay, *Daniel*, 207 Mich App at 51.

Concerning personal prejudice, defendant emphasizes that he was unable to properly treat his mental health during his pretrial incarceration. Defendant raised this concern at the time of his circuit court arraignment, noting that his incarceration was interrupting his prescription medication regimen. Two months later, defendant formally moved for a reduction of his bond requirements and asserted that if he was released, he would continue his mental health counseling. In his motion for a speedy trial, defendant again asserted that he was unable to continue his mental health treatment while in jail. We view this theory of personal prejudice with skepticism because there is little reason to believe that defendant would have properly addressed his mental health but for the pretrial incarceration. Defendant admitted that he was not compliant with his medication, and at the time of his arrest, in addition to being intoxicated, he had been awake for several days straight because he had been abusing methamphetamine. Defendant's claim that he would take his mental health seriously had he been released is, therefore, dubious. While ordinary stress and anxiety are inherent to pretrial incarceration, we conclude that defendant has not demonstrated he suffered additional prejudice in terms of his mental health treatment due to the delay in commencing his trial.

Turning to prejudice to his defense, defendant contends that the delay in this case affected most of the witnesses' ability to accurately recall the events at issue and resulted in Stigsell testifying at trial in jail-issued clothing. Defendant's reference to his own inability to recall certain details cannot be fairly attributed to the 10-month pretrial delay. Defendant admitted that he could not remember everything about the night in question because of his intoxication, and he also had been awake for several days straight due to methamphetamine abuse. There is no reason to believe that defendant's recollection would have been any better had the case been tried earlier. Conley and Schaus also claimed gaps in their memories. More specifically, Conley was unable to remember the date of a prior incident during which Borseth allegedly shot his gun in the direction of another person. She testified that the shooting occurred sometime over the summer of 2020, a few months before the incident at issue in this case. The earlier shooting was relevant only to defendant's perception of the danger Borseth presented, and because it was apparent that the shooting took place before October 2020, Conley's uncertainty regarding the date was insignificant. Schaus was unable to fully recall the sequence of events and their relation to his phone calls to the police, and this helped the prosecutor argue that defendant possessed the gun for longer than was reasonable for purposes of self-defense. However, the prosecution argued that the timing of the phone calls suggested defendant had the gun for up to five or six minutes, and considering Conley's opinion that defendant had the gun "a good ten, fifteen minutes," Schaus's confusion about the timing of his phone calls was immaterial.

Lastly, defendant contends that the delay prejudiced his defense because Stigsell's favorable testimony was likely discounted by the jury due to Stigsell's own incarceration at the time of trial. According to defendant, had the trial occurred even two weeks earlier, Stigsell would not have been in jail and would not have testified while wearing jail-issued clothing. Assuming

this is true, defendant still has not demonstrated that he was unfairly prejudiced. Defendant makes much of the negative inferences the jury might have reached because of Stigsell's appearance as a criminal but completely fails to appreciate that Stigsell's credibility would always have been questionable because of his friendship with defendant and obvious reluctance to provide incriminating testimony. Moreover, because Stigsell was called by the prosecution and offered testimony that was both incriminating and exculpatory, any poor assessment of Stigsell's credibility was just as harmful to the prosecution as it was to defendant.

## E. BALANCING THE FACTORS

Balancing these factors, defendant has not demonstrated that his convictions should be vacated on the basis of his right to a speedy trial. Convictions following delays far greater than the 10-month delay in this case have been consistently affirmed by this Court and the Michigan Supreme Court. See, e.g., *Williams*, 475 Mich 262-265 (concluding that speedy trial right was not violated by 19-month delay); *Waclawski*, 286 Mich App at 665-669 (affirming convictions after 24-month delay); *People v Cain*, 238 Mich App 95, 112-113; 605 NW2d 28 (1999) (citing several cases with delays of multiple years). The reason for the delay is viewed with a largely neutral tint, and the trial court seemingly undertook its best efforts to try defendant as promptly as possible, moving defendant's trial date forward each time it had an opportunity to do so. Although defendant formally asserted his right to a speedy trial, this alone is not decisive. Defendant has not established that he was personally prejudiced beyond ordinary pretrial anxiety, and we are not persuaded that the 10-month delay caused any harm to his defense.

On balance, defendant has not established a violation of his speedy-trial right.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, defendant argues that he was denied the effective assistance of counsel when his attorney failed to request jury instructions that would support the defense theories, namely, M Crim JI 7.20 (burden of proof for self-defense) and M Crim JI 7.3a (accident as a defense to specific-intent crime). We agree.

"Whether defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law." *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018). "Any findings of fact are reviewed for clear error, while the legal questions are reviewed de novo." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Defendant did not preserve this issue for review by moving for a new trial or evidentiary hearing before the trial court, *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), or filing with this Court a motion to remand for that purpose, *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Therefore, our review is limited to mistakes apparent on the record. *Head*, 323 Mich App at 539.

Claims of ineffective assistance are generally analyzed under the two-part test announced in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), which requires the defendant to demonstrate that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d

136 (2012). Under the first prong, we presume that counsel provided constitutionally effective assistance and acted pursuant to a sound trial strategy. *Abcumby-Blair*, 335 Mich App at 236-237. "This standard requires a reviewing court to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Id*. at 237 (quotation marks and citations omitted). Under the second prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Muhammad*, 326 Mich App at 63 (quotation marks and citation omitted). The defendant also bears the burden of establishing the factual basis for his or her claim. *Id*.

## A. FELON-IN-POSSESSION COUNTS

Defendant has established a valid claim of ineffective assistance of counsel with respect to defendant's convictions for felon-in-possession and felon-in-possession of ammunition because defense counsel failed to request an instruction regarding the burden of proof for self-defense.

When a defendant claims to have been denied the effective assistance of counsel on the basis of omitted jury instructions, this Court should first consider whether the instruction was legally applicable and factually warranted in the case. *People v Leffew*, 508 Mich 625, 638, 643; 975 NW2d 896 (2022). "Jury instructions must include all the elements of the charged offense and must not exclude material issues, defenses, and theories if the evidence supports them." *People v Spaulding*, 332 Mich App 638, 653; 957 NW2d 843 (2020) (quotation marks and citation omitted).

M Crim JI 7.20 provides: "The defendant does not have to prove that [he / she] acted in self-defense. Instead, the prosecutor must prove beyond a reasonable doubt that the defendant did not act in self-defense." In this case, the trial court determined that instructions on self-defense were appropriate. The final jury instructions, therefore, included the standard instruction regarding the use of nondeadly force in self-defense. See M Crim JI 7.22. In the context of that instruction, the court advised the jury that if defendant acted in lawful self-defense, his actions were justified and he was not guilty of any of the charged offenses. The final instructions also included M Crim JI 7.25, which addressed self-defense as a defense to the felon-in-possession and felon-in-possession of ammunition charges. However, the final instructions were silent as to who had the burden of proof regarding self-defense. To the extent that there was a factual basis for the self-defense instructions, the jury should have likewise been instructed that the prosecution had the burden of proving beyond a reasonable doubt that defendant did not act in self-defense, consistent with M Crim JI 7.20. See *Leffew*, 508 Mich at 649 (explaining that had defense-of-others instruction been given, it would have been accompanied by instruction that the prosecution has the burden of disproving the affirmative defense beyond a reasonable doubt).

The prosecution disputes whether any instructions regarding self-defense were warranted because nothing in the record suggests that defendant acted in self-defense when he pointed the gun at Conley and Schaus. However, this argument is only relevant with respect to the felonious assault charges and the felony-firearm count predicated on Count IV (felonious assault of Schaus). Self-defense can clearly apply to felonious assault charges, *People v Ogilvie*, 341 Mich App 28, 32, 40; 989 NW2d 250 (2022), but an instruction on that defense is appropriate only when there is at least some evidence supporting the self-defense theory. See *Leffew*, 508 Mich at 644. There

was no evidence that defendant pointed the gun at Conley or Schaus in order to defend himself against them or that either victim acted in a manner that would justify the use of nondeadly force in self-defense. Rather, the critical issue with respect to the felonious assault charges was whether defendant pointed the gun at them with the requisite intent. Because a successful self-defense theory "necessarily requires a finding that the defendant acted intentionally," *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010) (quotation marks and citation omitted), and defendant himself was adamant that he did not intentionally aim the gun at either victim, the adequacy of the self-defense instructions is irrelevant as it relates to the felonious assault charges and the corresponding felony-firearm charge. Nonetheless, defendant clearly raised a claim of self-defense claim with respect to the felon-in-possession and felon-in-possession of ammunition charges, and the testimony concerning defendant's belief that Borseth was pointing the gun at him provided a sufficient factual basis to instruct the jury regarding self-defense. *Leffew*, 508 Mich at 644. Because self-defense was properly before the jury relative to those charges, the jury should have been instructed that the prosecution had the burden of proving beyond a reasonable doubt that defendant did not act in self-defense, consistent with M Crim JI 7.20. See *id*. at 649.

Although defense counsel in this case secured the inclusion of instructions regarding the substantive requirements of a self-defense claim, she did not ask the court to instruct the jury regarding the burden of proof, and the applicable burden of proof was not directly addressed by the instructions provided. The jury was instructed that "[e]very crime is made up of parts called elements," and the prosecution was obligated to prove each element beyond a reasonable doubt. With respect to the possession charges, the court explained:

> The defendant is charged with possession of firearm in Count 1 and possession of ammunition in Count 2, after having been convicted of a specified felony. To prove this charge, *the prosecution must prove each of the following elements* beyond a reasonable doubt. First, that the defendant possessed, used, received, or carried a firearm and ammunition in this state. In this case, the parties do not dispute that the defendant has been convicted of a previous specified felony. [Emphasis added.]

Thus, the court's discussion of the burden of proof was tied to the elements of the offenses and offered little guidance concerning who bore the burden of proof concerning defenses. The self-defense instructions made it clear that defendant would not be guilty of either possession charge if he was acting in lawful self-defense, but they did not convey to the jury that the absence of self-defense was effectively an essential element of the possession charges that the prosecution had to prove beyond a reasonable doubt. Moreover, the inclusion of M Crim JI 7.20 in the final instructions would have been nothing but beneficial to defendant's case, such that there was no legitimate strategic reason to refrain from requesting it. Therefore, defense counsel's failure to request M Crim JI 7.20 was objectively unreasonable.

However, to obtain appellate relief, defendant must also prove that "but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51. Every trial witness who observed the incident opined that defendant took possession of the gun because he feared Borseth would shoot him, though the reasonableness of that belief was certainly in question. Even the prosecutor conceded in closing arguments that defendant may have been acting in self-defense when he disarmed Borseth. The

critical question before the jury was whether defendant's continued possession of the gun was justifiable self-defense. As to that question, Stigsell thought defendant was still holding the gun when Stigsell left the house a minute or two after summoning Schaus to intervene. Schaus testified that defendant held the gun for approximately one to three minutes, during which time defendant was looking for a place from which Borseth would not be able to retrieve the gun. According to Sergeant Sterbenz, at least four minutes elapsed between the beginning of Schaus's phone call and the point at which Sterbenz returned downstairs to try to defuse the situation and inquire about the gun's location. Conley claimed that defendant had the gun for perhaps 10 or 15 minutes. She recalled that defendant went from room-to-room trying to find a place to get rid of the gun and that he was reluctant to give it to her because he feared she would give it back to Borseth. Defendant opined he was holding the gun for approximately one or two minutes. He explained that he panicked, did not know what to do with the gun after he took it, and was initially unwilling to turn it over to Conley because he feared Borseth would overpower her and get the gun back. He only did so after she agreed to hide it and, even then, defendant insisted on blocking Borseth's view of Conley's destination as she left the room with the gun.

The jury might have believed that none of the eyewitnesses—defendant's friends, mother, and defendant himself—offered accurate testimony about how the events unfolded, but the evidence in this case was certainly close enough that the absence of an instruction specifically requiring the prosecution to disprove self-defense beyond a reasonable doubt might have tipped the scales in the prosecution's favor, thus undermining the reliability of the verdict and satisfying defendant's burden of establishing a reasonable probability of a different outcome but for defense counsel's deficient performance. Therefore, we conclude that defendant's convictions of felon-in-possession and felon-in-possession of ammunition must be vacated on the basis of ineffective assistance of counsel.

## B. FELONIOUS ASSAULT COUNTS

Defendant has established a valid claim of ineffective assistance regarding his convictions of two counts of felonious assault and the corresponding charge of felony-firearm because defense counsel failed to request an instruction regarding accident as a defense to a specific intent crime.

M Crim JI 7.3a provides:

> The defendant says that [he / she] is not guilty of [state crime] because [he / she] did not intend to [*state specific intent required*]. The defendant says that [his / her] conduct was accidental. If the defendant did not intend to [state specific intent required], [he / she] is not guilty. The prosecutor must prove beyond a reasonable doubt that the defendant intended to [state specific intent required].

Inasmuch as defendant claimed he did not intend to point the gun at Conley or Schaus, he was relying on an accident theory with respect to the felonious assault charges. Felonious assault is a specific-intent crime, *Rivera*, 120 Mich App at 54, to which an accident defense applies.

The Michigan Supreme Court's opinion in *People v Leffew* is instructive. In that case, the Supreme Court concluded that the defendants' "attorneys' failures to request the [defense-of-others] instruction constituted deficient performance, satisfying Strickland's first prong." *Leffew*,

508 Mich at 643. The Court reasoned that the defendants were entitled to the instruction because they "cleared the hurdle of putting forward 'some evidence' that" their actions were justified in defense of others. *Id*. at 644. The defendants' "trial strategy turned on a defense-of-others theory," but despite putting forth evidence and arguments advocating for "an acquittal under a defense-of-others theory," the attorneys "deprive[d the] jurors of a judge-given map to reach that destination" by failing to request a defense-of-others instruction. *Id*. at 646. The Court then provided an exhaustive analysis of the facts and concluded that the attorneys' errors warranted reversal because they undermined confidence in the trial's outcome. *Id*. at 646-656.

With respect to the first prong, this case is closely analogous to *Leffew*. Defense counsel clearly argued that defendant was entitled to acquittal based on the premise that, to the extent he pointed the gun at Conley and Schaus, he did so accidentally. Everyone who was present when defendant had the gun and testified at trial offered testimony that was at least partially consistent with defendant's contention that he never intentionally aimed the gun at them. Despite this, defense counsel failed to request an instruction regarding this accident defense, thereby depriving the jury "of a judge-given map to reach that destination" by failing to request a defense-of-others instruction. *Id*. at 646. Therefore, by failing to request the instruction, defense counsel's performance fell below an objective standard of reasonableness.

We likewise conclude that there is a reasonable probability that the outcome would have been different if the jury had been properly instructed. First, the evidence was not particularly strong. In cases that do not have particularly compelling evidence of guilt, "the magnitude of errors necessary for a finding of prejudice will be less than where there is greater evidence of guilt." *People v Urbanski*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359011); slip of ap 6 (quotation marks and citation omitted). There was not a single witness who unequivocally testified that defendant intentionally pointed the gun at Conley and Schaus or that he seemed to be trying to threaten anybody. Stigsell initially testified that the gun "wasn't directly pointed at" anybody and that "it was just like waved around in that direction." It was only after being confronted with his prior statement that Stigsell admitted that defendant "[t]echnically" pointed the gun toward Conley and Borseth. Schaus testified that defendant might have "indirectly" pointed the gun at people when he was waving it around. Schaus acknowledged that defendant "briefly" pointed the gun at himself and Conley, but he downplayed the severity of the incident and opined that defendant did not seem to be intentionally aiming the gun at anybody. Finally, Conley testified that defendant had not threatened anybody with the gun, and defendant testified that, if he did point the gun at anybody, he did so accidentally.

The jury did receive instructions that directly implicated the same legal theory presented in M Crim JI 7.3a when the trial court advised the jury that the felonious assault charges required proof that "defendant intended either to injure Mary Conley and/or James Schaus, or to make one or both of them reasonably fear an immediate battery." Defendant's convictions of both felonious assault charges suggest that the jury found defendant had the requisite intent and, therefore, did not act accidentally. See *People v Hawthorne*, 474 Mich 174, 184-185; 713 NW2d 724 (2006) (concluding that failure to instruct regarding accident defense did not prejudice the defendant because intent element in first-degree murder instructions "made it clear that a finding of accident would be inconsistent with a finding that defendant possessed the intent required for murder"). Nevertheless, this case must be viewed in conjunction with inappropriate arguments and improper statements of law put forth by the prosecution.

-10-

During closing arguments, the prosecution repeatedly insisted that defendant's intent was irrelevant and that it did not matter if the gun was pointed at Conley and Schaus accidentally. Instead, the prosecution erroneously stated that the only relevant inquiry was into the subjective apprehension experienced by the alleged victims. The prosecution made the following comment during its closing arguments:

> During this ruckus, the defendant pointed the gun at his mother and pointed the gun at . . . Schaus. Pointed the gun. That's felonious assault. That's assault with a dangerous weapon. You don't have to pull the trigger. *You don't necessarily have to intend, as long as your consequences are enough to put a person in reasonable fear*. You'll see that in the jury instructions. [Emphasis added.]

So, the prosecution not only stated that felonious assault turns on the consequences rather than the intent, it also insinuated that the jury instructions would support this misstatement of the law. The prosecutor then doubled down on this misstatement, explicitly saying that it did not matter if the gun was pointed accidentally:

> He makes it sound like it was accidental. *If a gun is pointed at me I don't care if it's accidental or not. If a gun is pointed at me that's felonious assault.* And *if you're going to judge him by his intent*, what was going on his mind, intoxication, with no excuse and no defense, right, so he's to be held accountable despite that intoxication. [Emphasis added.]

In addition to stating that defendant's intent was immaterial, the prosecution suggested that examining his intent was optional. The prosecution's message was clear: what mattered was the consequences of defendant's actions, not the intent behind his actions.

Defense counsel did attempt to correct the prosecution's misstatements during her closing arguments by addressing the fact that the jury "might have heard the prosecution say that [defendant's] intentions aren't important and if he was waving a gun around and it was pointed perhaps at someone that's all that matters." She then read the portion of the jury instructions stating that the prosecution must prove that defendant "intended either to injure Mary Conley and/or James Schaus or to make both of them reasonably in fear of an immediate battery." However, the prosecution returned to the issue during its rebuttal:

> Even if the defendant by his actions had no intentions to scare [Conley] or Mr. Schaus, it's enough—*we don't have to prove that he intended to do that*. It's enough if by his actions, and this is in the jury instructions, it would cause a reasonable person to be put in fear or apprehend an immediate battery. So, again, if a gun is pointed at you, would that put you in fear *regardless of what's going on in the mind of [defendant]*? What's going on in his mind shouldn't matter because intoxication is not a defense here. [Emphasis added.]

Although the trial court correctly instructed the jury regarding the intent element, no special attention was given to that issue, the legality of an accident defense, or the conflicting closing arguments. The distinction between whether an actor intended to cause a particular state of mind and whether the victim actually experienced that state of mind is a subtle one that could easily be

-11-

lost on lay jurors, especially after one of the attorneys vigorously advocated for an incorrect view of the law, without the trial court specifically endorsing or correcting either position. Moreover, as noted above, the evidence in this case was so close that any doubt as to whether the jury was misled regarding the intent element seriously undermines confidence in the outcome of defendant's trial.

In our view, the evidence in this case was too close to confidently conclude that the result would have been the same had the jury been instructed regarding accident as a defense to felonious assault. As noted earlier, the intent element was the primary disputed issue concerning the felonious assault charges, and the evidence regarding that element, taken at face value, supported an accident defense. Under these circumstances, defendant has demonstrated a reasonable probability of a different outcome but for defense counsel's deficient performance. Because defendant's felony-firearm conviction is predicated on his commission of felonious assault, he is entitled to appellate relief with respect to that conviction as well.

## V. CONCLUSION

In Docket No. 358789, we vacate defendant's convictions and sentences, and this case is remanded for additional proceedings consistent with this opinion. Because defendant's speedy-trial claim is without merit, the prosecution is entitled to bring the case to trial again. Docket No. 364433 is dismissed as moot because it only involves sentencing issues. See *People v Thue*, 336 Mich App 35, 39; 969 NW2d 346 (2021) (explaining that this Court does not address moot issues). We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Kristina Robinson Garrett
/s/ Allie Greenleaf Maldonado